FILED
2013 Sep-26  PM 03:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KANESHIA CONNER-GOODGAME,

     PLAINTIFF,

vs.                       2:12-cv-03426-IPJ

WELLS FARGO BANK, N.A.,

     DEFENDANT.

## MEMORANDUM OPINION

Pending before the court are Defendant Wells Fargo's motion for summary judgment (doc. 23), brief and evidentiary materials in support thereof (doc. 24); Plaintiff's brief in opposition to Defendant's motion and evidentiary materials in support thereof (docs. 27, 28); Defendant's reply to Plaintiff's response (doc. 31); Defendant's motion for leave to supplement the summary judgment record (doc. 32); Plaintiff's response to Defendant's motion to supplement the record (doc. 36); and Plaintiff's motion for leave to file a response to Defendant's reply brief (doc. 37).

## FACTUAL BACKGROUND

The relevant facts gleaned from the record are as follows. Temp Agency Robert Half assigned Plaintiff Kaneshia Conner-Goodgame to work in Wells

Fargo's home equity department in 2011. Plaintiff Depo. pp. 35-36 (doc. 27-2). Conner-Goodgame worked at Wells Fargo from September 26, 2011, until her termination on November 18, 2011. *Id.* at 36. Anthony Washington served as Conner-Goodgame's supervisor during her time at Wells Fargo. Plaintiff Decl. ¶ 3 (doc. 27-1). Washington has worked at Wells Fargo since December 2008 and currently serves as loan administration manager 1. Washington Depo. p. 9 (doc. 27-4). At the time of Conner-Goodgame's termination, Sara Rawlings was the director of the department in which Washington and Conner-Goodgame worked. *Id.* at p. 15. Leslie Gunn worked through Robert Half as a Wells Fargo administrator and served in this position when Conner-Goodgame was terminated. Gunn Depo. pp. 11, 46 (doc. 27-5).

Plaintiff claims that Washington, who is openly gay, Washington Depo. p. 67 (doc. 27-4), "talked about sex literally every day [she] worked" at Wells Fargo. Plaintiff Decl. ¶ 4 (doc. 27-1). Plaintiff alleges that Washington "would talk about how he wanted to have sex with certain male celebrities and actors." *Id.* Washington allegedly discussed "in graphic detail" his sexual activity with his partner, Manny, making the following comments: "Manny hit me from the back last night"; "that [Washington] needed bigger breasts because Manny couldn't kiss them"; "that [Washington] could give a good 'blow job' and that you needed to be able to do that to keep your man"; "that [Washington] wasn't giving Manny any

2

sex that night because he wasn't paying the bills"; "that a woman couldn't do anything for [Washington]"; and that "[Washington] was the 'girl' and Manny was the 'man.'" *Id.* Washington, however, claims that he never talked to Conner-Goodgame about his sexual activities or discussed these topics in her presence. Washington Depo. p. 67-68 (doc. 27-4); Washington Decl. ¶¶ 9, 11 (doc. 24-7).

In her deposition testimony, Conner-Goodgame identified two instances in which Washington made comments of a sexual nature directly to her:

> [MS. CONNER-GOODGAME]: . . . And I did have one – I forgot to tell you about an incident when I was sitting at my desk and he was like, you're quiet today. . . . And he was like, well, I had a bad night, I'm in a bad mood . . . . He goes because whenever – I cannot think of his partner's name. He got mad because he didn't want to do – have sex with him because he didn't want to pay the bills. . . . I'm like, I do not care to hear all that is what I'm saying to myself, but I'm still working, like, trying to block it because I don't think that was appropriate for work to even think about things like that – talk about things like that.

> [MR. DAVIS]: And that happened on one occasion?

> [MS. CONNER-GOODGAME]: Yeah, that was just on one occasion. . . .

> [MR. DAVIS]: Then you say he did make a comment to you about a member of your family? . . .

> [MS. CONNER-GOODGAME]: . . . [W]hen he came by my desk, I had on my screensaver from my son's 13th birthday party. And my son and my brother were standing and my husband, I was on the picture that I had my screensaver. He's like, oh that's some chocolate, I'll bite that, and I'm like what. . . . [Y]ou just said sexually chocolate, you will bite that.[1]

---

[1] In her declaration, Plaintiff describes the photo as being of her husband, her brother-in-law, and her son. Plaintiff Decl.¶ 4 (doc. 27-1).

Plaintiff Depo. pp. 115-16 (doc. 27-3). Plaintiff claims that the comments about

her family picture particularly offended her because her son suffered sexual abuse

from a man when he was younger. Plaintiff Decl. ¶ 4 (doc. 27-1). Washington

claims that he never saw a picture of Conner-Goodgame's family, called anyone

"sexual chocolate," or stated that he wanted to bite anyone. Washington Depo. at

68-69 (doc. 27-4); Washington Decl. ¶ 10 (doc. 24-7). Gunn testified that she

remembers speaking with Washington about the incident, that Washington said he

made the comment as a joke, and that she asked him to be mindful of what he said

to Conner-Goodgame in the future. Gunn Depo. p. 41 (doc. 27-5).

Plaintiff further claims that Washington would make sexual comments to

women in the office, but not men. Plaintiff Decl. ¶ 4 (doc. 27-1). In her deposition,

Plaintiff testified that she overheard the majority of Washington's comments:

[MR. DAVIS]: Did he say that to anyone other than yourself?

[MS. CONNER-GOODGAME]: He, he was talking about it, just, you
know, walking past, talking, just running his mouth. He would be on his cell
phone, or be on his office phone with the door open and you can just hear it.
And then they would call and get in an argument about who was going to
pay the bills. I would know the whole conversation. . . .

[MR. DAVIS]: So, he didn't direct those at you, you were overhearing
conversations that he was having?

[MS. CONNER-GOODGAME]: Yeah, that made me feel very
uncomfortable. . . .

[MR. DAVIS]: But other than the comment about your child, the other
comments were – that were sexual in nature did not relate to you, they

related to other people and he was on the phone or talking to other people, correct? . . .

[MS. CONNER-GOODGAME]: That's correct. . . .

Plaintiff Depo. pp. 99-100; 115-16 (doc. 27-3).

Conner-Goodgame's mother contracted HIV from a blood transfusion, and died from AIDS when Plaintiff was sixteen years old. Plaintiff Decl. ¶ 3 (doc. 27-1). Plaintiff claims she suffers from anxiety and depression as a result of her mother's death. Plaintiff further claims that she informed Washington of her disability in case something happened to her at work. Plaintiff Depo. p. 62 (doc. 27-2). Conner-Goodgame alleges that Washington disclosed the information about her mother's death and Conner-Goodame's disability to co-workers Rachel Allen, Elizabeth Strickland, and Shanita Otey. As a result of this disclosure, says Conner-Goodame, other employees would not eat the food she brought to an office pot luck. Plaintiff Decl. ¶ 3 (doc. 27-1); Plaintiff Depo. pp. 65-66 (doc. 27-2).[2] Washington denies that Plaintiff told him anything about her anxiety and depression or the cause of her mother's death. Washington Depo. p. 70 (doc. 27-4); Washington Decl. ¶ 12. Shanita Otey also claims that no one told her about

---

[2] In her declaration, Plaintiff states that she "know[s] it must have been Anthony who told the co-workers because [she] did not tell any of them." Plaintiff Decl. ¶ 3 (doc. 27-1). However, Plaintiff also testified in her deposition that co-workers Rachel Allen, Elizabeth Strickland, and Shanita Otey told her that Washington told people that Plaintiff was crazy and that Washington had been talking to them about the cause of her mother's death. Plaintiff Depo. pp. 65-67 (doc. 27-2).

Conner-Goodgame's disability or the cause of her mother's death. Otey Decl. ¶ 3 (doc. 24-8).

On November 15, 2011, Plaintiff met with Washington to allegedly tell "him that [she] did not like hearing all his sexual comments" and that her "son had been sexually abused by a man when he was younger and that [she] did not want to hear any more sexual comments from him or discussion of his sex life." Plaintiff Decl. ¶ 5 (doc. 27-1). Plaintiff also claims that during this meeting she complained to Washington about his alleged disclosure of the cause of her mother's death. *Id.* Washington claims that he and Conner-Goodgame did not discuss any of these issues during this meeting. Washington Depo. pp. 82-83; 86-87 (doc. 27-4). On November 18, Plaintiff forwarded Leslie Gunn the email in which she asked to meet with Washington on November 15. Plaintiff's forwarded email to Gunn stated: "This is the email from Tuesday I went in and talked to him about how well I was doing and he said I was the best person here and I never talk and that I always get my work done. . . ." Conner-Goodgame email to Leslie Gunn of November 18, 2011, 2:58:22 PM; Exhibit 6 to Washington Depo (doc. 24-4).

On the morning of Plaintiff's termination, November 18, 2011, Washington sent Conner-Goodgame an email at 11:12 a.m., which stated "Kay, You be on the phone a little too much, it wasn't a problem earlier but now I'm getting a little concerned about your usage. Please refrain from being on the phone too much

from this point forward. Thanks." Email of November 18, 2011; Exhibit 4 to

Plaintiff's Depo. (doc. 24-2). Washington further claims that on the morning of

November 18, when he asked Plaintiff to participate in training with the other

employees, she responded that she didn't "need to do any training because she

knows what she's got going on," and that Plaintiff's public response "embarrassed

[Washington] in front everybody. . . ." Washington Depo. p. 71 (doc. 27-4).

Washington then terminated Conner-Goodgame's assignment on the afternoon of

November 18, 2011. *Id.* at 87.

Gunn also testified that she vaguely recollected Washington speaking about

Plaintiff's excessive cell phone usage on November 18 and that Gunn had left

Plaintiff a message about said cell phone usage. Gunn Depo. pp. 36-37 (doc. 27-

5). Washington claims that he spoke with Plaintiff about her excessive phone

usage prior to the email he sent her on November 18. Washington Depo. pp. 47-48

(doc. 27-4). On November 21, 2011, Washington sent an email to his supervisor

Sara Rawlings stating that he terminated Conner-Goodgame because of her

attitude and excessive phone usage. Email from Anthony Washington to Sara

Rawlings of November 21, 2011; Exhibit 9 to Washington Depo (doc. 24-4).

Plaintiff, conversely, claims that she did not use her phone excessively for

personal calls and that she did not have a bad attitude. Plaintiff Decl. ¶¶ 6-7 (doc.

27-1). Plaintiff's coworker Shanita Otey claims that Plaintiff told her that as a

result of Washington's lies to Robert Half about Plaintiff's work, Plaintiff "couldn't take that and was leaving." Exhibit A to Otey Decl. p. 2 (doc. 24-8).

Plaintiff filed a charge of discrimination with the EEOC on November 28, 2011. Exhibit 6 to Plaintiff's Depo. (doc. 24-2). On September 24, 2012, Plaintiff filed a complaint in this court alleging the following claims: sexual harassment in violation of Title VII; retaliatory discharge for having complained about sexual harassment; retaliatory discharge for having complained about religious discrimination; disability discrimination in violation of the ADA; retaliatory discharge for having complained about disability discrimination; discrimination in violation of GINA; and retaliatory discharge for having complained about discrimination under GINA. Complaint (doc. 1). Plaintiff moved for a partial dismissal of her complaint and has the following claims remaining before the court: sexual harassment in the forms of a hostile work environment and tangible employment action in violation of Title VII; retaliatory discharge for having complained about perceived sexual harassment in violation of Title VII; and retaliatory discharge for having complained about perceived discrimination in violation of GINA. Plaintiff's Motion for Partial Dismissal (doc. 21).

## STANDARD OF REVIEW

A court may grant a movant's motion for summary judgment "when the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010); *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

In determining whether to grant the motion, the court must view "the evidence and all reasonable inferences from that evidence. . . in the light most favorable to the nonmovant." *Jean-Baptiste*, 627 F.3d at 820 (11th Cir. 2010); *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). However, the court need only draw those inferences "to the extent supportable by the record." *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010). Once met by the moving party, the burden shifts to the non-moving party to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

Moreover, "[a] party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must

set forth specific facts showing there is a genuine issue for trial." *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990). In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillards, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

## DISCUSSION

### I.   Plaintiff's Title VII Sexual Harassment Claim

#### A.   Tangible Employment Action[3]

A plaintiff may rely on two theories to make out a sexual harassment claim: (1) that she suffered a tangible employment action or (2) that she was subjected to a hostile work environment.  *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480

---

[3] In Plaintiff's reply to Defendant's motion for summary judgment, Plaintiff asserts that she "has pled her case under both types : (1) hostile work environment, and (2) tangible employment action." Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment p. 10 (doc. 28). Defendant asserts that Plaintiff never intended to make a tangible employment action claim. In support of this assertion, Defendant points to a series of emails between Defense counsel and Plaintiff's counsel wherein Defense counsel asked whether "some gender-based adverse action [wasn't] being asserted in part(a) [of Count I of Plaintiff's Complaint] other than the hostile environment itself." Exhibit A to Defendant's Reply to Plaintiff's Response in Opposition to Motion for Summary Judgment (doc. 31-1). Plaintiff's counsel responded "No, that's it," presumably confirming that Plaintiff was not alleging sexual harassment based on the tangible employment action theory. *Id.* Even assuming that Plaintiff did intend to assert a claim under the tangible employment action theory, however, the court finds that Plaintiff's claim under this theory fails as a matter of law for the reasons discussed below.

F.3d 1287, 1300 (11th Circuit 2007). Additionally, "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998). However, "[f]or any sexual harassment preceding the employment decision to be actionable . . . the conduct must be severe or pervasive." *Id.* at 754.

Conner-Goodgame has alleged sexual harassment under both the tangible employment action and hostile work environment theories. Plaintiff suffered a tangible employment action in her termination, but has failed to establish that the tangible employment action she suffered was a result of the sexual harassment. Certainly, Conner-Goodgame's termination was not a result of the refusal to submit to any sexual demands. Rather, Plaintiff's only factual support of her sexual harassment claims are allegations of Washington's sexual comments. *See* Complaint ¶¶ 22-24 (doc. 1); Plaintiff's Response to Defendant's Motion for Summary Judgment pp. 3-4 (doc. 28). Additionally, Plaintiff states that she "never refused to do anything [Washington] asked [her] to do." Plaintiff Decl. ¶ 7 (doc. 27-1). *See Burlington Industries, Inc. v. Ellerth*, 524 US 742, 754 (citations omitted) ("Because Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of

severe or pervasive conduct."). Therefore, because Plaintiff's sexual harassment claim rests purely on her allegations of Washington's alleged sexual comments, Plaintiff's tangible employment action claim fails as a matter of law.

### B.   Hostile Work Environment

Plaintiff's hostile work environment claim fails as a matter of law for two reasons: (1) Plaintiff cannot establish that she was discriminated against on the basis of her sex, and (2) Plaintiff has failed to establish that the alleged sexual harassment she suffered was severe or pervasive. A person seeking to make out a sexual harassment claim must demonstrate the following:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).  Moreover, the Plaintiff must show that the alleged conduct was both subjectively and objectively offensive:

> The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive. Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's

12

position, considering all the circumstances.

*Mendoza,* 195 F.3d at 1246 (citations omitted).

First, Plaintiff cannot establish that she suffered sexual harassment because of her sex. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris v. Florklift Systems*, Inc., 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring). The Supreme Court noted in *Oncale* that "[a] trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). Washington's alleged comments were not sex-specific, but Plaintiff claims that Washington "would talk about his sex life and say sexual things *to [her] and other women in the department*, but [that] *he did not make these comments to men*." Plaintiff Decl. ¶ 4 (doc. 27-1) (emphasis added). However, Conner-Goodgame testified in her deposition that Washington's comments were not directed at her or other women in the office, but that she overheard the majority of Washington's comments. Plaintiff Depo. p. 99-100; 114-15 (doc. 27-3).

While the court will draw all inferences in favor of Conner-Goodgame, the

nonmovant, the court need only draw those inferences to the extent supportable by the record. Here, the record, namely Conner-Goodgame's assurances that she *overheard* all but two of Washington's alleged sexual comments, does not support a finding that Washington only directed his comments at women. As the Eleventh Circuit has noted, "[a]n equal opportunity curser does not violate a statute whose concern is, as the Supreme Court has phrased it, 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Baldwin*, 480 F.3d at 1302 (11th Circuit 2007) (quoting *Oncale*, 523 U.S. at 80 (1998)).

Second, even assuming that Washington directed his alleged comments at the women in the office, Plaintiff cannot establish that the alleged harassment she suffered was severe or pervasive. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21 (1993) (citations omitted). In determining whether the alleged harassment is severe or pervasive, the court considers: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. As to the pervasiveness of the alleged sexual harassment, Conner-Goodgame only

14

testified about two instances in which Washington made comments of a sexual nature to her. Plaintiff Depo. pp. 115-16 (doc. 27-3). Leslie Gunn also testified that Plaintiff did not complain to her about any sexually inappropriate comments. Gunn Depo. pp. 38-40 (doc. 27-5).

Moreover, even accepting, *arguendo*, Conner-Goodgame's allegations that Washington made sexual comments on a daily basis, the comments Conner-Goodgame alleges are not severe as a matter of law. Although Plaintiff has demonstrated that she was subjectively offended by Washington's comments, she cannot establish that said comments were of a nature that a reasonable person would find hostile or abusive. Leslie Gunn testified that the comments Washington allegedly made regarding Plaintiff's family did not strike her as derogatory or offensive. Gunn Depo. pp. 38-40 (doc. 27-5). The other comments that Plaintiff alleges in her declaration similarly lack the severity to make out a hostile work environment claim. Even if the court accepts that they were offensive to Conner-Goodgame, the comments were just that – mere offensive utterances. Washington allegedly saying that he wanted to have sex with male celebrities, that he wasn't giving his partner any sex that night because he wasn't paying the bills, that a woman couldn't do anything for him, or that Washington was the girl and Manny was the man are not objectively offensive. Nothing in these comments could be taken as physically threatening, humiliating, or severe.

Moreover, Washington's alleged comments that his partner "hit [him] from the back," that he needed bigger breasts because his partner couldn't kiss them, that he could "give a good blow job," and that "you nee[d] to be able to do that to keep your man" might have been in poor taste for the workplace, but were not so severe, humiliating, hostile or abusive as to meet Title VII's standard for severe or pervasive behavior. *See Murphy v. City of Aventura*, 2010 WL 2490932 at * 3 (11th Cir. 2010) (affirming district court judgment that behavior was not severe or pervasive where employer's alleged comments to male and female employees, including "dumb shit," "stupid fuck," "dumb fuck," "slut," "whore," "bitch," and "hooker" "fell under the rubric of general vulgarity that Title VII does not regulate"). *Cf. Reeves v. CH Robinson Worldwide*, 594 F.3d 798, 812 (11th Cir. 2010) (finding severe behavior where "[t]he terms 'whore,' 'bitch,' and 'cunt,' the vulgar discussions of women's breasts, nipples, and buttocks, and the pornographic image of a woman in the office were targeted" at plaintiff's gender).

Finally, Conner-Goodgame stated that her performance at Wells Fargo never faltered, and, therefore, Washington's comments did not unreasonably interfere with Conner-Goodgame's work performance. In fact, Conner-Goodgame testified that she "really wanted the job back because [she] knew [she] was performing well. . . ." Plaintiff Depo. p. 92 (doc. 27-3). Thus, even taking Conner-Goodgame's allegations of Washington's conduct as true and considering those

16

allegations in light of the factors for determining severe or pervasive conduct, Plaintiff has failed to establish that a genuine issue of material fact exists as to whether she was subjected to a hostile work environment.

## II.    Plaintiff's Title VII Retaliation Claim

A plaintiff makes a prima facie case of retaliation by showing: "that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) (citing *Wideman v. Wal-Mart Stores, Inc.* 141 F.3d 1453, 1454 (11th Cir. 1998)). To establish that she engaged in statutorily protected activity, "a plaintiff must show that she had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (citation omitted). A plaintiff demonstrates a reasonable, good faith belief in an employer's unlawful employment practices by showing that "(1) he subjectively believed in good faith that [the employer's] behavior was discriminatory, and that (2) his belief was objectively reasonable in light of the facts and record presented." *Mulkey v. Bd. of Cmmrs. of Gordon Cty.*, 2012 WL 3655629 at *4 (11th Cir. 2012) (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008)). Whether an employee's belief is objectively reasonable "must be measured against existing

substantive law." *Id.* (citing *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351

(11th Cir. 1999)).

If a plaintiff makes a prima facie case, the burden shifts to the employer to

proffer a legitimate, non-retaliatory reason for the adverse employment action.

*Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008). If an employer can

provide a legitimate non-discriminatory reason, the plaintiff must show that the

employer's given reason is pretext for retaliation. *Id.* A plaintiff may demonstrate

an employer's pretext by showing "that the employer offered inconsistent reasons

for the challenged employment action." *Faircloth v. Herkel Investments, Inc.*,

2013 WL 1197256 at * 3 (11th Cir. 2013) (citing *Tidwell v. Carter Products*, 135

F.3d 1422, 1428 (11th Cir. 1998)). However, a plaintiff may only overcome

summary judgment by showing "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could find them

unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th

Cir. 1997).

Conner-Goodgame suffered an adverse employment action in that she was

terminated. However, she cannot establish a prima facie case of retaliation because

she cannot demonstrate that she was engaged in statutorily protected activity.

Viewing the record in favor of Conner-Goodgame, she has neither established that

she subjectively in good faith believed that Washington's behavior was discriminatory nor that her belief was objectively reasonable. First, Conner-Goodgame testified that aside from two comments made directly to her, she merely overheard the remainder of Washington's comments. Thus, Conner-Goodgame could not in good faith believe that Washington's behavior was directed only at the women in the office, or, in other words, was discriminatory against women. Second, Conner-Goodgame's belief that Defendant was engaged in discriminatory activity was not objectively reasonable given the nature of the alleged comments Washington made. *See supra* Part IB. Measuring Washington's alleged comments against existing substantive law, Conner-Goodgame did not hold an objectively reasonable belief that the comments she allegedly overheard and the two comments Washington made to her were so severe and pervasive as to alter the terms and conditions of her employment.

Even assuming *arguendo* that Plaintiff could establish a prima facie case of retaliation, Plaintiff cannot demonstrate that Defendant's proffered reason for her termination was pretextual. Washington testified that he made the decision to terminate Conner-Goodgame's assignment because of her perceived poor attitude and her excessive phone usage. Washington Depo. p. 50 (doc. 27-4). Washington testified that shortly after Plaintiff began working under him, he detected problems with Plaintiff's attitude at work:

19

[MR. PORTER]: What kind of thing would she say that sounded arrogant?

[MR. WASHINGTON]: . . . I would ask her to do something, she would be talking to a team member, it's early in the morning, we need to be focused, sit down to work. . . .
     [She would respond] "Oh, I've done twelve loans already, I don't need to do this. I don't need to train, I know what I'm doing."

[MR. PORTER]: Are you saying you would say that to her and that would be her reply to you?

[MR. WASHINGTON]: And that would be her reply in front of everybody.

*Id.* at 41. Moreover, Plaintiff's email to Washington on November 18 referenced her own personal phone usage: "Thank you and again I apologize if my phone calls to tech support or internal employees have caused problems *or personal calls*." Email of November 18, 2011; Exhibit 4 to Plaintiff Depo. (Doc. 24-3) (emphasis added).

In her deposition, Plaintiff claimed that she was given three different reasons for why she was terminated – cell phone usage, tardiness, and low production. Plaintiff Depo. pp. 91-92 (doc. 27-3). Yet, even as soon as November 21, 2011, a mere three days after Plaintiff was fired, Washington said he terminated Plaintiff because of her attitude and excessive phone usage. Email from Anthony Washington to Sara Rawlings of November 21, 2011 11:50 AM; Exhibit 9 to Washington Depo. (doc. 24-4). Moreover, Washington has not changed this articulation to date. Washington testified in his deposition that he had a problem with Plaintiff's "smug" attitude and that other employees, including Deanna Lee

and Elizabeth Stripling, had complained to him about Plaintiff's attitude.

Washington Depo. at 40 (doc. 27-4).

The only evidence Plaintiff seems to have of Defendant's pretextual reason for terminating her is Plaintiff's own refutation of Washington's allegations of her poor attitude and excessive phone usage. Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment p. 24 (doc. 28). Plaintiff attempts to rely on *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005), for the proposition that Plaintiff's refutation of Defendant's alleged facts is enough to establish pretext. However, a plaintiff's refutation of the incidents giving rise to an event "fail to demonstrate pretext. . . without calling into question [the employer's] sincere belief that they occurred." *Id.* Conner-Goodgame has not presented any evidence that Washington's belief that she used the phone excessively or had a poor attitude was insincere. Washington never disputed that Conner-Goodgame's work performance was satisfactory. Rather, he consistently maintained that he based his decision on Conner-Goodgame's poor attitude and excessive phone usage. Additionally, Conner-Goodgame apologized for her personal calls in the email response she sent to Washington on November 18. Email of November 18, 2011; Exhibit 4 to Plaintiff Depo. (doc. 24-2). Plaintiff's attempt to rely on *Munoz v. Oceanside Resorts*, 223 F.3d 1340 (11th Cir. 2000), is also misplaced, because the plaintiff in that case presented more

21

evidence than just his refutation of the employer's alleged facts. *See Munoz*, 223 F.3d 1340, 1345 n. 5 (plaintiff's evidence of pretext of age discrimination included an unblemished employment record of twenty-seven years; termination following a single warning when the employee handbook outlined termination after three warnings; evidence that plaintiff's replacement had received several reprimands during the course of his employment; and evidence that a waiter of plaintiff's age did not comport with the employer's "trendy" image).

Moreover, the court does not sit as a super-personnel department, and it is not the court's role to second-guess the wisdom of an employer's business decision, as long as those decisions were not made with a discriminatory motive. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). A plaintiff seeking to establish pretext "must meet the proffered reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of the reason." *Id.* Because the only support Conner-Goodgame has given for her claim of Defendant's pretext is her own refutation of Defendant's testimony, Conner-Goodgame cannot establish that Defendant's proffered reason for terminating her was pretextual. Thus, Conner-Goodgame's claim that Defendant retaliated against her in violation of Title VII fails as a matter of law.

## III.   Plaintiff's GINA Retaliation Claim

Plaintiff's final claim is that Defendant retaliated against her because she

made a complaint about what she thought was Defendant's violation of the

Genetic Information Nondiscrimination Act ("GINA"). Plaintiff's Motion for

Partial Dismissal p. 1 (doc. 21). GINA makes it unlawful for an employer "to

disclose genetic information concerning an employee . . . ." 42 U.S.C. § 2000ff-

5(b). GINA further defines "genetic information" as "information about (1) such

individual's genetic tests, (ii) the genetic tests of family members of such

individual, and (iii) the manifestation of a disease or disorder in family members

of such individual." 42 U.S.C. §2000ff(4)(A). Under GINA, it is also unlawful for

a person "to discriminate against any individual because such individual has

opposed any act or practice made unlawful by" the act. 42 U.S.C. § 2000ff-6(f).

Plaintiff does not allege a GINA violation, but claims that Defendant retaliated

against her for opposing what she perceived to be a GINA violation. Plaintiff's

Motion for Partial Dismissal pp. 1-2 (doc. 21).

Because GINA's anti-retaliation provision tracks the language of Title VII's

anti-retaliation provision, the court has analyzed Plaintiff's retaliation claim under

Title VII's framework for retaliation. *Compare* 42 U.S.C. § 2000ff-6(f) *with* 42

U.S.C. § 2000e-3(a). *See also Jiles v. United Parcel Service, Inc.*, 2010 WL 27958

at * 3 n. 5 (11th Cir. 2010) (applying Title VII retaliatory discharge framework to

retaliation claim under Florida Civil Rights Act because of statutes' parallel

language). Again, Conner-Goodgame must establish that she was engaged in

23

Case 2:12-cv-03426-IPJ   Document 41   Filed 09/26/13   Page 24 of 27


statutorily protected activity, that she suffered an adverse employment action, and that the statutorily protected activity was causally connected to the adverse employment action. Conner-Goodgame may demonstrate that she was engaged in statutorily protected activity by showing that she subjectively perceived Defendant to be engaged in discriminatory practices and that those beliefs were objectively reasonable as measured against substantive law.

While Conner-Goodgame may have subjectively believed in good faith that Washington's disclosure of her mother's AIDS status was discriminatory, that belief is not objectively reasonable as measured against substantive law. The regulations promulgated pursuant to GINA state that "[a] covered entity shall not be considered to be in violation of this part based on the use, acquisition, or *disclosure of medical information that is not genetic information about a manifested disease, disorder, or pathological condition of an employee* or member, even if the disease, disorder, or pathological condition has or may have a genetic basis or component." 29 CFR § 1635.12 (emphasis added).

First, the court notes that information about Plaintiff's mother's AIDS does not constitute *genetic* information about a manifested disease or disorder. Even if the court were to assume that AIDS has some sort of genetic basis,[4] the EEOC has

---

[4] The court questions whether AIDS has any sort of genetic basis, because "[a]lthough [HIV] is a retrovirus that inserts itself into human DNA, HIV is not itself human DNA and measuring its presence does not constitute a genetic test under the law's definition." Genetics & Public Policy Center Information on the Genetic Information Nondiscrimination Act (GINA), p.

noted that GINA does not protect individuals discriminated against on the basis of impairments that have a genetic basis. *See* Background Information for EEOC Final Rule on Title II of the Genetic Information Nondiscrimination Act of 2008, *available at* http://www.eeoc.gov/laws/regulations/gina-background.cfm. The EEOC notes that "GINA is concerned primarily with protecting those individuals who may be discriminated against because an employer thinks they are at increased risk of acquiring a condition **in the future**." *Id.* (emphasis in original). Conner-Goodgame had no chance of acquiring HIV in the future as a result of her deceased mother's AIDS. Any chance Conner-Goodgame had of acquiring HIV from her mother ended with Plaintiff's infancy.[5] Moreover, the EEOC notes, "[e]xamples of tests that *are not genetic tests* include an HIV test." *Id.* (emphasis added). Thus, given that an HIV test is not a genetic test and AIDS results from HIV, Plaintiff's mother's AIDS status could not be considered genetic information. While the EEOC's determinations are not binding on the court, "they do constitute a body of experience and informed judgment to which we may

2, *available at* http://www.dnapolicy.org/resources/WhatGINAdoesanddoesnotdochart.pdf. Additionally, the court discusses HIV and AIDS jointly here because it is the destruction of body cells caused by HIV that ultimately results in a person's development of AIDS. *See* National Institute of Allergy and Infectious Diseases, How HIV Causes AIDS, *available at* http://www.niaid.nih.gov/topics/HIVAIDS/Understanding/howHIVCausesAIDS/Pages/cause.asp x (last updated April 03, 2012).

[5] *See* AIDS.gov, Pregnancy & Childbirth, *available at* http://aids.gov/hiv-aids-basics/prevention/reduce-your-risk/pregnancy-and-childbirth/ ("An HIV-positive mother can transmit HIV to her baby in three ways: [d]uring pregancy, [d]uring vaginal childbirth, [t]hrough breasfeeding.") (last updated Jan. 25, 2012)

properly resort for guidance." *Harrison v. Benchmark Electronics Huntsville, Inc.*, 593 F.3d 1206, 1216 n. 10 (11th Cir. 2010) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

Plaintiff also argues that because the regulation states that entities are not liable for disclosure of non-genetic medical information about an *employee's* manifested disease or disorder, Defendant may still be held liable for an alleged disclosure of non-genetic information concerning Plaintiff's *family member's* disease or disorder. Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment p. 27 (doc. 28). However, Plaintiff provides no support for reading the provision so strictly. The court fails to see how the regulation could protect entities that disclose an employee's non-genetic information about a manifested disease or disorder, but find entities in violation of the statute if they disclose the non-genetic information of an employee's family member. Such a reading of the provision would give more protection to an employee's family member's information than to the actual employee's information. The court will not read the statute in such a way to provide an absurd result. *See In re Lehman*, 205 F.3d 1255, 1255-56 (11th Cir. 2000) ("Although statutory interpretation begins with the language of the statute itself, a court may look beyond the plain language of a statute if applying the plain language would produce an absurd result.") (citations omitted). Thus, because Washington's alleged disclosure of

non-genetic information about Conner-Goodgame's mother's AIDS status would not violate GINA, Conner-Goodgame has failed to establish that Defendant discriminated against her for opposing an act or practice made unlawful by GINA.

## CONCLUSION

Having considered the foregoing, and being of the opinion that the Defendant's motion for summary judgment is due to be granted on all of the Plaintiff's claims, the court shall grant said motion by separate Order.

**DONE** and **ORDERED** this 26th day of September 2013.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE